REISSUED FOR PUBLICATION
MAY 23 2022
OSM
U.S. COURT OF FEDERAL CLAIMS

# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 19-970V
Filed: April 26, 2022
UNPUBLISHED

| | |
|---|---|
| TIFFANY ADAMS, on behalf of K.A., a minor,<br><br>                     Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>                     Respondent. | Special Master Horner<br><br>Dismissal; Insufficient Proof; Vaccine Rule 21 |

*Tiffany Adams*, Danville, KY, pro se petitioner.
*Matthew Murphy*, U.S. Department of Justice, Washington, DC, for respondent.

### DECISION[1]

On July 5, 2019, Tiffany Adams ("petitioner") filed a petition on behalf of her minor child, K.A., alleging that K.A. suffered encephalopathy, encephalitis, and audio neuropathy caused-in-fact, or significantly aggravated by,[2] K.A.'s Varicella, MMR, Hepatitis A, Hib, DTaP, and Prevnar vaccinations administered on July 11, 2016. (ECF No. 1 ("Pet").) For the reasons discussed below, this petition is now dismissed.

### I.     Procedural History

Petitioner filed K.A.'s medical records and an affidavit between September of 2019 and February of 2020. (ECF Nos. 9-22.) Respondent filed his Rule 4(c) report

---

[1] Because this decision contains a reasoned explanation for the special master's action in this case, it will be posted on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. *See* 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the decision will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information the disclosure of which would constitute an unwarranted invasion of privacy. If the special master, upon review, agrees that the identified material fits within this definition, it will be redacted from public access.

[2] Although petitioner pleaded "significant aggravation" in the alternative, she pleaded facts that are not compatible with such a claim. Specifically, petitioner states "prior to receiving the MMR, Varicella, Hepatitis A, Hib, DTaP, [and] Prevnar on July 11, 2016 vaccination(s), petitioner did not suffer from encephalopathy or any serious related disabilities." (*See* Petition at ¶ 5.)

1

recommending against compensation on June 22, 2020.  (ECF No. 26.)  Following the government's filing of the respondent's report, I ordered petitioner to file an expert report supporting her claim.  (Sched. Order (NON-PDF), 6/25/2020.)  Petitioner's prior counsel moved for six motions for extension of time to file the required expert report.  (ECF Nos. 27, 30-34.)

Petitioner's counsel represented that an expert was initially retained to begin drafting a report, but withdrew for reasons unrelated to the case.  (ECF No. 31.)  A second expert was reportedly retained by April of 2021, but that expert needed additional information from petitioner.  (ECF No. 33.)  However, petitioner reportedly became unresponsive to counsel at that time. (*Id.*)  Although petitioner's expert reportedly completed a review of the case, petitioner remained unresponsive to her prior counsel and counsel indicated on August 12, 2021, that he intended to withdraw as counsel.  (ECF Nos. 34-35.)  On October 25, 2021, petitioner's prior counsel advised that he had resumed contact with petitioner, but that petitioner was seeking other counsel.  (ECF No. 39.)

On October 26, 2021, I issued an Order notifying petitioner that her claim is currently incomplete; that she has been provided a substantial amount of time to prove her case; that she had until January 4, 2022, to file a motion to substitute counsel; and that if she failed to file a motion to substitute that I would entertain a motion to withdraw by her current counsel and designate petitioner as a *pro se* petitioner.  I explained that

> It has now been well over one year since petitioner was ordered to file an expert report supporting her claim and no expert report has been filed. Moreover, petitioner is currently represented by counsel experienced in litigating cases in this program. Petitioner's current counsel has advised that this case has already been reviewed by an expert without any resulting report. I also note that counsel has represented that petitioner's failure to communicate with counsel has contributed to delays in this case.

(ECF No. 40, p. 3.)  I advised that "I will not allow this case to sit unresolved indefinitely" and that, in light of the history of the case, I intended to issue an "Order to Show Cause" why this case should not be dismissed.  (*Id*. at 4.)  Petitioner did not effectuate any substitution of counsel and I granted her counsel's motion to withdraw on January 10, 2022.[3]  (ECF No. 46.)

An Order to Show Cause why this case should not be dismissed was also issued on January 10, 2022, giving petitioner a final period of 90 days to either file an expert opinion supporting her claim or submit a written brief pursuant to Vaccine Rule 8(d) explaining why she feels compensation is appropriate in this case.  (ECF No. 49.)  I

---

[3] As part of his subsequent motion to withdraw, petitioner's counsel confirmed that "[c]ounsel for petitioner diligently and repeatedly contacted petitioner to discuss the Order, including sending her a copy of the Order via certified, regular and electronic mail, calling client (7) times and sending her (3) follow up e-mails." (ECF No. 41, p. 2.)  Petitioner's counsel represented that his certified mailing confirmed petitioner's receipt of the order on November 9, 2021.  He further indicated that petitioner contacted him on December 30, 2021, and informed him that she wished to proceed as a *pro se* petitioner.  (*Id.*)

explained that "[a]bsent the granting of a motion for extension of time, the deadline set by this order will represent petitioner's final opportunity to file a medical opinion supporting her claim or to explain pursuant to Vaccine Rule 8(d) why she otherwise believes she is entitled to compensation.  If petitioner fails to comply with this order, this case will be involuntarily dismissed for failure to prosecute." (*Id*. at 4 (original emphasis omitted).)  I instructed that petitioner could show good cause for a motion for extension of time if she could provide a written statement by a medical expert indicating that he or she is willing to opine and that a complete report would be forthcoming.  (*Id*.)

The April 11, 2022 deadline set by the Order to Show Cause passed and petitioner did not file an expert report or any other response.  Petitioner has not otherwise been in contact with the Court in any other manner.

## II.     Factual History as Reflected in the Medical Records

K.A. was born on June 20, 2015, vaginally, at 40 2/7 weeks, with no complications. (Ex. 9, p. 17, 20.)  K.A.'s newborn screen was normal. (Ex. 5, p. 37.)  Petitioner, K.A.'s mother, had a history of gestational diabetes, hypothyroidism, sarcoidosis, GERD, obesity, hypertension, depression, and urticaria. (Ex. 9, p. 10; Ex. 4, pp. 8-9, 43, 130.)

On July 7, 2015, K.A. sought emergency treatment at the University of Kentucky Medical Center for a temperature of 101.8 degrees. (Ex. 5, pp. 40-41.)  The emergency room practitioners completed a full septic workup. (*Id*.)  K.A.'s lumbar puncture displayed an elevated white blood cell count and she was started on Ampicillin, Cefotaxime, and Acyclovir. (*Id.* at 40.)  K.A.'s PCR for enterovirus was positive. (*Id*.)  K.A. was discharged on July 8, 2015, with a diagnosis of enteroviral meningitis, and instructed to seek follow-up evaluation with her pediatrician. (*Id*.)

Following her emergency room visit, on July 17, 2015, K.A. sought evaluation with her pediatrician, Kristine Anido, M.D. ("Dr. Anido") at White House Clinics. (Ex. 5, pp. 17-18.)  Since discharge, petitioner reported that K.A. had returned to baseline. (*Id*.)  K.A.'s physical examination was normal. (*Id*.)

On August 27, 2015, K.A. returned to Dr. Anido's office for a well-child visit.  (Ex. 5, pp. 11-15.)  K.A. passed a developmental assessment and was diagnosed with reflux and placed on Ranitidine. (*Id*.)  K.A. was also diagnosed with ankyloglossia [tongue unable to protrude completely]. (*Id*.)  K.A. also received vaccinations in connection with the visit. (*Id*.)  On November 2, 2015, K.A. returned to Dr. Anido for her four-month well-child examination. (Ex. 5, pp. 6-9.)  K.A. passed her developmental assessment. (*Id.*)

On January 4, 2016, during K.A.'s sixth-month well-child examination with Joshua Wiglesworth, M.D. ("Dr. Wiglesworth"), she was developmentally appropriate, including vocalizing single consonants, smiling, and turning to sounds. (Ex. 5, pp. 47-

3

50.)  K.A.'s GERD improved and she no longer required medications.  (*Id*.)  She received her routine vaccinations that day.  (*Id*.)

On January 29, 2016, at age seven months, K.A. began treatment with Nurse Practitioner, Ruth Nelson Crab Orchard Primary Care.  (Ex. 3, pp. 9-11.)  K.A. sought treatment for an ear check and petitioner noted that K.A. was pulling at her teeth at times.  (*Id*.)  A developmental assessment was not conducted during that visit.  (*Id*.)

On March 25, 2016, K.A. had her nine-month physical with Nurse Nelson.  (Ex. 3 at 19.)  K.A. stood holding on, fed herself, sat without support, and jabbered mama/dada.  (*Id*.)  On June 22, 2016, K.A. had a twelve-month physical wherein the petitioner reported that K.A. was healthy, but there was not a detailed developmental assessment.  (Ex. 3 at 18.)  However, the physical assessment indicated that K.A. was developing normally for a one-year old.  (*Id*.)

On July 11, 2016, K.A. received the subject vaccinations, including MMR, varicella, Hepatitis A, Hib, DTaP, and Prevnar at Lincoln County Health Department in Stanford, Kentucky.  (Ex. 2, p. 1.)

On July 21, 2016, K.A. sought treatment at Crab Orchard Primary Care because petitioner was concerned about K.A.'s decreased hearing and noted that K.A. was warm the night before.  (Ex. 3, pp. 3-4.)  K.A. exhibited decreased hearing, and she was referred to an audiologist.  (*Id*.)  Later the same day, K.A. went to the emergency room at University of Kentucky Medical Center for clinginess, subjective fever, hearing loss, and one episode of vomiting.  (Ex. 8, pp. 17-18.)  The emergency room physician documented that she was appearing ill, but in no acute distress.  (*Id*.)  K.A.'s temperature was 105.9 and she was given Tylenol and hydrated.  (*Id*.)  K.A. was discharged the same day and diagnosed with a viral illness.  (*Id*.)

On September 9, 2016, K.A. returned to Nurse Nelson at Crab Orchard Primary Care for hearing concerns.  (Ex. 3, pp. 5-6.)  Petitioner reported that K.A. was not talking or responding to noise.  (*Id*. at 5.)  Nurse Nelson diagnosed K.A. with speech delay and a hearing deficit, and referred her to an ENT.  (*Id*.)  On November 3, 2016, K.A. presented to Drs. McDowell and Hignight, ENT.  (Ex. 10, p. 1.)  Petitioner noted that K.A. had hearing loss shortly after her one-year vaccinations.  (*Id*.)  On November 18, 2016, K.A. had tubes inserted into her ears for persistent serous otitis media at Ephraim McDowell Regional Medical Center.  (Ex. 7, p. 3.)

On February 17, 2017, K.A. presented to the University of Kentucky ENT/Otolaryngology Clinic to have an auditory brainstem response evaluation for her history of speech and language delay.  (Ex. 1, p. 3.)  K.A.'s test was normal bilaterally.  (*Id*.)  On April 18, 2017, K.A. presented to ENT, Dr. McDowell.  (Ex. 10, p. 2, 16.)  K.A. had significant symptoms of sleep disordered breathing with markedly enlarged tonsils and adenoids.  (*Id*.)  Dr. McDowell noted that K.A. was scheduled to have a tonsillectomy and adenoidectomy on April 24, 2017.  (*Id*.)

4

On May 4, 2017, a VAERS report was completed indicating that the DTaP, HIB, Hep A, MMR, Prevnar 13, and VZV caused a "permanent disability." (Ex. 6, pp. 697-699.) Specifically, the VAERS report notes that "the second day after vaccines, [K.A.] stopped responding to sounds." (*Id.*)

On June 19, 2017, K.A. had an autism evaluation at Cincinnati Children's Hospital. (Ex. 6, pp. 2-6.) K.A.'s evaluation was consistent with the diagnosis of Autism Spectrum Disorder and Global Developmental Delay. (*Id.*)

On July 19, 2017, K.A. saw Mark Schapiro, M.D. ("Dr. Schapiro") at Cincinnati Children's for a neurological consultation due to developmental regression, global developmental delay, and mixed receptive and expressive language disorder. (Ex. 1, pp. 12-15.) K.A. was receiving speech, occupational, and developmental therapy from Kentucky First Steps. (*Id.*) Following his evaluation, Dr. Schapiro felt that K.A. had developmental delay and autism spectrum disorder. (*Id.*) Dr. Schapiro also noted that "if her primary care team has concerns about future immunizations, then they should consider referral to Infectious Disease for guidance on future immunizations." (*Id.*) Dr. Schapiro recommended continued therapy, video EEG for staring spells, and follow-up with neurology as needed. (*Id.*) He also recommended several studies to look for a possible cause for the developmental regression, including an MRI spectroscopy, metabolic work-up, mitochondrial work-up, and TSH. (*Id.*) K.A.'s EEG that day was normal. (Ex. 6, p. 157.)

On July 21, 2017, K.A. had her two-year examination with Praveena Salins, M.D. ("Dr. Salins"). (Ex. 1, pp. 42-45.) K.A. was non-verbal and autistic. (*Id.*) Dr. Salins' assessment was autistic disorder. (*Id.*)

On August 5, 2017, K.A. presented for an MRI spectroscopy, which showed a focus of T2/FLAIR hyperintense signal in the left periatrial white matter with associated periventricular white matter volume loss compatible with gliosis from remote insult or injury, and also a discrete multicystic T2 hyperintense lesion in the left posterior periventricular white matter. (Ex. 1, p. 17.) However, overall, the radiologist noted K.A.'s MRI spectroscopy was "normal." (*Id.*)

On February 6, 2018, K.A. presented to Rehabilitation Services at Ephraim McDowell Health for evaluation of autism and global developmental delays. (Ex. 1, pp. 20-24.) Following evaluation, the assessment exhibited that K.A. had autism with delayed play skills, delayed self-regulation, and sensory processing and fine motor delays. (*Id.* at 21.) Occupational therapy was recommended. (*Id.*)

K.A.'s autism genetic panel was completed on March 27, 2018 and was negative. (Ex. 6, pp. 680-681.)

On June 14, 2018, K.A. saw Nurse Practitioner, Karen Burkett ("NP Burkett") with developmental and behavioral pediatrics at Cincinnati Children's Hospital. (Ex. 6, pp.

291-292.)  NP Burkett ordered additional testing including an intellectual disability panel, mitochondrial panel, and a genetics panel.  (*Id*.)

On August 17, 2018, K.A. had a repeat brain MRI, which showed stable multiloculated CSF fields, slightly dilated occipital horn of the left lateral ventricle with adjacent punctate foci of T2/FLAIR signal abnormality in the left trigonal white matter consistent with remote insult, mild delay of white mater myelination, and sinus findings. (Ex. 6, p. 352.)  On August 21, 2018, petitioner and Mark Schapiro, M.D. ("Dr. Schapiro") discussed the repeat MRI and Dr. Schapiro noted that the repeat MRI did not show a tumor.  (Ex. 6, p. 595.)

K.A. presented for her three-year-old physical with Dr. Salins on September 14, 2018.  (Ex. 1, pp.  48-50.)  K.A. had severe speech disturbance, autistic disorder, and global developmental delay.  (*Id*.)  As to vaccinations, Dr. Salins noted that K.A. "has [a] medical exemption due to Autism and encephalopathy which may have been related to vaccines given at 15 months."  (*Id*.)

On October 9, 2018, petitioner and Julia Anixt, M.D. ("Dr. Anixt") corresponded regarding K.A.'s developmental regression.  (Ex. 1, pp. 30-36.)  Dr. Anixt noted that K.A.'s genetic testing, including a microarray, fragile X, MECP2, and her autism panel was normal.  (*Id*. at 34.)  Dr. Anixt's noted that her developmental issues were "neurological in origin and therefore, represent, an encephalopathy."  (*Id*.)  Dr. Anixt recommended continued additional therapies.  (*Id*.)

On October 30, 2018, K.A.'s mitochondrial whole genome sequencing was completed, and no mutation was identified.  (Ex. 6, pp. 446-450.)

On February 8, 2019, K.A. saw Dr. Salins as petitioner reported that she was not sleeping well for the past three months.  (Ex. 1, p. 51.)  Dr. Salins diagnosed K.A. with sleep disturbance.  (*Id*.)

### III. K.A.'s Medical Records Do Not Preponderantly Support Petitioner's Claim

In general, to receive compensation in the Vaccine Program, a petitioner must prove either (1) that the vaccinee suffered a "Table Injury" – *i.e.*, an injury falling within the Vaccine Injury Table – corresponding to a covered vaccine, or (2) that the vaccinee suffered an injury that was actually caused by a covered vaccine.  *See* §§ 13(a)(1)(A) and 11(c)(1).  To satisfy her burden of proving causation in fact, petitioner must show by preponderant evidence: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury."  *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005).  The Vaccine Act also limits compensation only to those cases that are supported by either medical records or the opinion of a competent physician.  The Vaccine Act states with regard to a finding that petitioner can recover for

an injury that: "The special master or court may not make such finding based on the claims of a petitioner alone, unsubstantiated by medical records or medical opinion." 42 U.S.C. § 300aa-13(a)(1).

Here, petitioner has not alleged a Table injury, and the medical record evidence does not support such a claim. Encephalopathy and encephalitis are Table injuries for vaccines containing whole cell pertussis bacteria, extracted or partial cell pertussis bacteria, or specific pertussis antigen(s), including, DTaP within 72 hours of vaccination, and for vaccines containing measles, mumps, and rubella virus or any of its components, including MMR within five-to-15 days following vaccination. *See* 42 C.F.R. § 100.3. However, K.A. never had an altered level of consciousness, and accordingly, would not meet the criteria for an acute encephalopathy; nor did any of her doctors diagnose her with an acute encephalopathy. *See* 42 C.F.R. § 100.3(c)(2)(i)(A)(1). Moreover, she did not have evidence of encephalitis, which requires evidence of an inflammatory process within the brain by way of detection of an abnormal white blood count in the CSF, EEG findings consistent with encephalitis, or neuroimaging studies consistent with an encephalitis. *See* 42 C.F.R. § 100.3(c)(3)(i)(A)(B). None of this is evidenced in KA's history. Thus, even if petitioner pled Table injuries in this case, the evidence does not support such claims.

With respect to petitioner's cause-in-fact claim, K.A.'s medical records present neither a medical theory causally linking her subject vaccinations to her alleged injuries of encephalopathy, encephalitis, and audio neuropathy, nor a logical sequence of cause and effect showing that the vaccines were the reason for her alleged injuries. Petitioner also has not offered any evidence to show that the onset of K.A.'s alleged vaccine injuries occurred in a timeframe within which vaccine causation could be ascribed. While some of K.A.'s treating medical providers reference the fact of K.A.'s prior vaccinations, or express suspicion of a possible, prior vaccine-related encephalopathy (*see* Ex. 1, p. 48), none of them causally attribute the vaccinations as the cause of her claimed injuries.[4] Rather, K.A.'s treating physicians alternatively diagnosed her with autism and her medical records reflect ongoing evaluation and treatment for the same.

---

[4] Medical records and/or statements of a treating physician do not *per se* bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated. *See* 42 U.S.C. §300aa-13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Human Servs.*, 88 Fed. Cl. 706, 746 n.67 (2009) ("there is nothing ... that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted"). In fact, if the treating physician is simply recognizing a temporal association, it offers little to nothing on the question of causation. *Isaac v. Sec'y of Health and Human Servs.*, No. 08-601V, 2012 WL 3609993, at *26 (Fed. Cl. Spec. Mstr. July 30, 2012); *see also Devonshire v. Sec'y of Health and Human Servs.,* No. 99-031V, 2006 WL 2970418, at *19 (Fed. Cl. Spec. Mstr. Sept. 28, 2006) (medical expert's "*post hoc ergo proptor hoc* reasoning…has been consistently rejected by the Court and is 'regarded as neither good logic nor good law'") (quoting *Fricano v. U.S.,* 22 Cl. Ct. 796, 800 (1991) (emphasis in original)); *see also Stapleford v. Sec'y of Health and Human Servs.,* No. 03-234V, 2009 WL 1456441, at *17 n.24 (Fed. Cl. Spec. Mstr. May 1, 2009) (referencing medical record "is quite different from an indication that such physician has reached a *conclusion* concerning a causal relationship") (emphasis in original), *aff'd*, 89 Fed. Cl. 456 (Fed. Cl. 2009).

Entitlement has consistently been denied in cases alleging vaccine-related autism following an extensively litigated omnibus proceeding with six test cases. *See e.g.*, *Cedillo v. Sec'y of Health & Human Servs.*, No. 98-916V, 2009 WL 331968 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), *aff'd*, 89 Fed. Cl. 158 (2009), *aff'd*, 617 F.3d 1328 (Fed. Cir. 2010); *Hazlehurst v. Sec'y of Health & Human Servs.*, No. 03-654V, 2009 WL 332306 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), *aff'd* 88 Fed. Cl. 473 (2009), *aff'd*, 604 F.3d 1343 (Fed. Cir. 2010); *Snyder v. Sec'y of Health & Human Servs.*, No. 01-162V, 2009 WL 332044 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), *aff'd,* 88 Fed. Cl. 706 (2009); *King v. Sec'y of Health & Human Servs.*, No. 03-584V, 2010 WL 892296 (Fed. Cl. Spec. Mstr. Mar. 12, 2010); *Mead v. Sec'y of Health & Human Servs.*, No. 03-215V, 2010 WL 892248 (Fed. Cl. Spec. Mstr. Mar. 12, 2010); *Dwyer v. Sec'y of Health & Human Servs.*, No. 03-1202V, 2010 WL 892250 (Fed. Cl. Spec. Mstr. Mar. 12, 2010). And, in any event, petitioner has offered no theories of causation to suggest K.A.'s autism may have been vaccine-related.

As noted above, the Vaccine Act itself forbids a special master from ruling in petitioner's favor based solely on his or her assertions; rather, the petition must be supported by *either* medical records *or* by the opinion of a competent physician. 42 U.S.C. § 300aa-13(a)(1). Accordingly, petitioner could theoretically have proven a case by amplifying K.A.'s medical records with additional expert opinion explaining how and why K.A.'s vaccines should be viewed as a cause of encephalopathy, encephalitis, or audio neuropathy. However, despite having been given a full and fair opportunity to submit an expert report, petitioner did not provide such an opinion.

### IV.    Dismissal Is Also Appropriate for Failure to Prosecute

Special Masters are meant to provide the parties a "full and fair *opportunity*" to present their respective cases. *See* Vaccine Rule 3(b)(2)(emphasis added); *see also Kreizenbeck v. Sec'y of Health & Human Servs.*, 945 F.3d 1362, 1365-66 (Fed. Cir. 2020). Pursuant to Vaccine Rule 8(a), the special master "will determine the format for taking evidence and hearing argument based on the specific circumstances of each case and after consultation with the parties." Vaccine Rule 8(d) expressly authorizes the special master to decide a case based on the written record without holding an evidentiary hearing. Additionally, Vaccine Rule 21(b)(1) provides that "[t]he special master or the court may dismiss a petition or any claim therein for failure of the petitioner to prosecute or comply with these rules or any order of the special master or the court."

Here, petitioner has been provided a full and fair opportunity to develop the record. Petitioner was provided ample opportunity (22 months in total) to provide an expert opinion supporting her claim, inclusive of the period during which she was represented by counsel and the period during which she continued as a *pro se* petitioner. However, she did not do so. Moreover, her counsel represented that the inability to come forward with an expert opinion during that time was directly impacted by petitioner's failure to provide a retained expert with necessary information and to consistently communicate with counsel. The obligation to diligently pursue this claim

includes an obligation for petitioner to cooperate with her own counsel to prosecute her case. *E.g. Fisher v. Sec'y of Health & Human Servs.,* No. 10-784V, 2012 WL 2202940 (Fed. Cl. Spec. Mstr. May 10, 2012) (explaining that "[t]hrough her own unresponsiveness to counsel, petitioner has failed to prosecute her claim. Accordingly, dismissal is now appropriate.") Petitioner was first ordered to file an expert report in June of 2020.  Even allowing for the unforeseen exit of her first potential expert, petitioner's counsel confirmed that a second expert had been identified by April of 2021. After that, petitioner has had fully a year to produce a report yet has failed to do so. *See Winner v. Sec'y of Health & Human Servs.,* No. 00-736V, 2013 WL 6139637 (Fed. Cl. Spec. Mstr. Oct. 31, 2013) (dismissing a case for insufficient proof where petitioners did not produce an expert report after five motions for extension of time).

After petitioner and her counsel determined that she would proceed *pro se*, I provided petitioner with explicit warning that her case was in jeopardy of dismissal due to dilatory behavior and allowed her 90 days to either identify an expert to opine or provide a written brief supporting her claim pursuant to Vaccine Rule 8(d).  She did neither.  Nor, in fact, did she provide any response at all or contact the court in any way.

In my October 26, 2021 order giving petitioner time to locate new counsel, I had cautioned that:

> The obligation to prosecute this case is not counsel's alone. It extends to petitioner's own cooperation with counsel to present the evidence necessary to pursue her claim. Additionally, if petitioner does not retain new counsel and I allow current counsel to withdraw, then petitioner will become what is known as a "*pro se*" or unrepresented petitioner. In that case, petitioner will become *solely* responsible for meeting all deadlines and filing obligations pursuant all orders issued by the undersigned.

(ECF No. 40, p. 3 (emphasis original).)

Subsequently, in my January 10, 2022, Order to Show cause, I specifically warned that:

> Because petitioner is currently proceeding on a *pro se* basis, petitioner is solely responsible for meeting all deadlines and filing obligations pursuant to this order or any other order issued by the undersigned. Petitioner should read this order carefully as it explains how to avoid involuntary dismissal of her claim. Pursuant to this order, petitioner must act by no later than Monday, April 11, 2022.

(ECF No. 49, p. 1 (original emphasis omitted).)  Significantly, I also explained to petitioner how she could avoid dismissal by at a minimum showing good cause for a motion for extension of time.  She did not do so.  Additionally, I explained that, even if she did not produce an expert report, petitioner could advocate for her claim in a written

brief.  She did not do so.  These failures are not in keeping with an intention to continue prosecution of this case.

Accordingly, it is reasonable and appropriate to resolve this case on the existing record pursuant to Vaccine Rule 8(d) as petitioner has had a full and fair opportunity to present her case.  Moreover, petitioner's failure to produce an expert report and failure to respond to the Order to Show Cause constitute a failure to prosecute pursuant to Vaccine Rule 21(b) that forms a separate basis for dismissal.  *Tsekouras v. Sec'y of Health & Human Servs.*, 26 Cl. Ct. 439 (1992), *aff'd*, 991 F.2d 810 (Fed. Cir. 1993) (per curiam), ("[c]ontrolling precedent considers dismissal appropriate when failure to act is deemed willful, when it is in violation of court orders, when it is repeated, and when clear warning is given that the sanction will be imposed"); *Sapharas v. Sec'y of Health & Human Servs.,* 35 Fed. Cl. 503 (1996) ("[n]ot only did petitioner fail to meet the court's . . . deadline, but he also ignored the chief special master's 'warning' order, clearly placing petitioner on notice that failure to respond to the court's order . . . would result in dismissal of the claim. The chief special master clearly did not abuse his discretion in dismissing this case for failure to prosecute"); *Corbett ex rel. N.C. v. Sec'y of Health & Human Servs.,* 17-460V, 2021 WL 6062952 (Fed. Cl. Spec. Mstr. Dec. 2, 2021) (dismissing case pursuant to Vaccine Rule 21(b) due to *pro se* petitioner's failure to respond to orders demonstrating an interest in maintaining the case); *Garrard v. Sec'y of Health & Human Servs.,* 20-1331V, 2021 WL 1235362 (Fed. Cl. Spec. Mstr. Mar. 10, 2021) (same).

## V.     Conclusion

This case is now **DISMISSED** both for failure to prosecute and for insufficient proof.  Absent a motion for review, the clerk of the court is directed to enter judgment in accordance with this decision.[5]

**IT IS SO ORDERED.**

s/Daniel T. Horner
Daniel T. Horner
Special Master

---

[5] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party, either separately or jointly, filing a notice renouncing the right to seek review.